IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

ANGELA SHOEMAKE                                                              MOVANT

v.                                                              No. 1:10CR123-MPM-DAS

UNITED STATES OF AMERICA                                                 RESPONDENT

**MEMORANDUM OPINION**

This matter comes before the court on the motion of Angela Shoemake, through counsel, to vacate, set aside, or correct her sentence under 28 U.S.C. § 2255. The government has responded to the motion. The court conducted a hearing on the matter and has considered the testimony and evidence presented by the Movant and the Government. For the reasons set forth below, the instant motion to vacate, set aside, or correct sentence will be denied.

*Habeas Corpus* **Relief Under 28 U.S.C. § 2255**

The writ of *habeas corpus*, a challenge to the legal authority under which a person may be detained, is ancient. Duker, The English Origins of the Writ of Habeas Corpus: A Peculiar Path to Fame, 53 N.Y.U.L.Rev. 983 (1978); Glass, Historical Aspects of Habeas Corpus, 9 St. John's L.Rev. 55 (1934). It is "perhaps the most important writ known to the constitutional law of England," *Secretary of State for Home Affairs v. O'Brien*, A.C. 603, 609 (1923), and it is equally significant in the United States. Article I, § 9, of the Constitution ensures that the right of the writ of *habeas corpus* shall not be suspended, except when, in the case of rebellion or invasion, public safety may require it. *Habeas Corpus*, 20 Fed. Prac. & Proc. Deskbook § 56. Its use by the federal courts was authorized in Section 14 of the Judiciary Act of 1789. *Habeas corpus* principles developed over time in both English and American common law have since been codified:

> The statutory provisions on *habeas corpus* appear as sections 2241 to 2255 of the 1948 Judicial Code. The recodification of that year set out important procedural limitations and additional procedural changes were added in 1966. The scope of the writ, insofar as the statutory language is concerned, remained essentially the same, however, until 1996, when Congress enacted the Antiterrorism and Effective Death Penalty Act, placing severe restrictions on the issuance of the writ for state prisoners and setting out special, new *habeas corpus* procedures for capital cases. The changes made by the 1996 legislation are the end product of decades of debate about *habeas corpus*.

*Id*.

## Section 2255 Proceedings

Section 28 U.S.C. § 2255 permits an inmate serving a sentence after conviction of a federal crime "to move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). As with the writ of *habeas corpus*, *see* 28 U.S.C. §§ 2241, 2254, a § 2255 motion sets forth only four bases on which a motion may be made: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Thus, a prisoner must claim either a constitutional violation or want of subject matter jurisdiction to invoke 28 U.S.C. § 2255. In the absence of constitutional or jurisdictional defects, a federal prisoner may invoke § 2255 only if the error constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio,* 442 U.S. 178, 185 (1979).

The district court must first conduct a preliminary review of a section 2255 motion, and "[i]f it plainly appears from the motion, any attached exhibits, and the record of the prior proceeding that the moving party is not entitled to relief, the judge must dismiss the motion." Rules Governing Section 2255 Proceedings, Rule 4(b). If the motion raises a non-frivolous claim to relief, the court must order

the Government to file a response or to take other appropriate action. *Id.* The judge may then require the parties to expand the record as necessary and, if good cause is shown, authorize limited discovery. *Rules Governing Section 2255 Proceedings,* Rules 6–7.

After reviewing the government's answer, any transcripts and records of prior proceedings, and any supplementary materials submitted by the parties, the court must decide whether an evidentiary hearing is warranted. *Rules Governing Section 2255 Proceedings,* Rule 8. Under the statute, an evidentiary hearing must be held unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). However, the court need not hold an evidentiary hearing if the prisoner fails to produce "independent indicia of the likely merit of [his] allegations." *United States v. Edwards,* 442 F.3d 258, 264 (5th Cir. 2006) (quoting *United States v. Cervantes,* 132 F.3d 1106, 1110 (5th Cir. 1998)).

Ultimately, the petitioner bears the burden of establishing his claims of error by a preponderance of the evidence. *See Wright v. United States,* 624 F.2d 557, 558 (5th Cir. 1980). For certain "structural" errors, relief follows automatically once the error is proved. *See Burgess v. Dretke,* 350 F.3d 461, 472 (5th Cir. 2003). For other errors at the trial court level, the court may grant relief only if the error "had substantial and injurious effect or influence" in determining the outcome of the case. *Brecht v. Abrahmson,* 507 U.S. 619, 637 (1993); *see also United States v. Chavez,* 193 F.3d 375, 379 (5th Cir. 1999) (applying *Brecht's* harmless error standard in a § 2255 proceeding). If the court finds that the prisoner is entitled to relief, it "shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

**Facts and Procedural Posture**

Angela Shoemake was indicted on seven counts of sexual exploitation of a minor in violation of 18 U.S.C. § 2251(a). In the years leading up to her arrest, Ms. Shoemake had lost her job[1] as a bank teller, had a miscarriage, and had gone through a divorce. She had begun watching pornography during the day, as well as contacting strangers online so that they could meet and have sex. During this period, Ms. Shoemake had entered into a sexual dialog with a man named "Toby" over the internet. Toby claimed to be a wealthy pilot with a home in Seattle and another in Hawaii. He encouraged her to take sexually explicit photographs of her two boys, aged 6 and 8, and to send them to him. Toby was very specific about what he wanted the photos to depict, and all of his requests involved sexual content. Ms. Shoemake testified at the hearing that she said "no" many times, but eventually, Toby made her "a lot of promises and that's why [she] took the pictures." *See also* PSR at 6. The promises included moving her and her children to live with him in Seattle so that he could take care of them. *Id*. Angela Shoemake then had her young sons pose as Toby wished, and she physically participated in the sexual abuse; she was visible in some of the photographs abusing her boys.

Ms. Shoemake's local boyfriend discovered some of the disturbing images on her computer, took a photograph of them with his cellular phone, and told the boys' father – who immediately reported it to the Sheriff's Department. Investigators obtained a warrant, with an affidavit describing the graphic sexual nature of the photographs and noting that the two boys were minors (approximately 7 and 9 years old). During the search, Angela Shoemake waived her *Miranda* rights and gave a statement admitting that she had taken the sexually explicit photographs of her two young sons

---

[1] At the hearing she testified that she lost her job because she made inappropriate sexual comments to her coworkers, but she told the United States Probation Service during her presentencing interview that she lost her job because she took a fraudulent check.

(actually aged 6 and 8 at the time). Agents seized her computer and digital cameras, identifying over 200 sexually explicit images of the two boys, including approximately twenty in which Ms. Shoemake was penetrating the six-year-old with a vibrator.

Ms. Shoemake's attorney, Steven Wallace, met with Ms. Shoemake and her family, then drove to Jackson, Mississippi, to view the photographs. According to Mr. Wallace, Ms. Shoemake downplayed the nature and content of the photographs when she spoke with him. However, after he had viewed the photographs, he returned and advised Ms. Shoemake that she was in big trouble and that he should try to negotiate a plea deal with the Government. He told her that going to trial on the seven-count Indictment would be foolhardy given the volume and nature of the government's evidence.

At first, the Government was unwilling to negotiate at all and wished to proceed to trial on all seven counts. Had Ms. Shoemake received the maximum sentence for each count (which would have been appropriate under the Guidelines), then she faced a sentence of 30 years' incarceration on each count – a total of 210 years. However, after negotiating with Mr. Wallace, the Government agreed that Ms. Shoemake could plead guilty to Count I of the Indictment (sexual exploitation of children) and Count I of the Information (transportation and distribution of child pornography by means of a computer). The maximum sentence for exploitation of children was 30 years; the maximum sentence for distribution of child pornography was 20 years; as such, Ms. Shoemake faced a maximum of 50 years in prison, rather than 210.

At the Change of Plea hearing, the court asked Ms. Shoemake if her attorney had discussed with her how the Sentencing Guidelines might apply to her case. She expressed doubt as to whether she and her attorney had discussed the Guidelines. After conferring with Mr. Wallace, she answered,

"Okay. Yes, sir." Doc. 46 at 12. Counsel then stated, "If Your Honor please, I'm sorry. I didn't tell her that these were the sentencing guidelines; I just told her what would go forth in the investigation." *Id*.[2]

At the Sentencing Hearing, defense counsel offered no objections to the Presentence Report and no evidence or testimony in mitigation. The court sentenced Ms. Shoemake according to the Guidelines, which called for the statutory maximum for each offense: 360 months for Count I of the Indictment and 240 months for Count I of the Information – a total of 50 years.

Ms. Shoemake told her attorney to file a direct appeal, and he attempted to do so. However, he made an incorrect selection when electronically docketing the Notice of Appeal, and it did not appear on the docket as such. As a result, her appeal did not proceed, and the improperly docketed document languished. When five years passed with no news regarding her appeal, Ms. Shoemake inquired and discovered that an appeal had not been (correctly) filed on her behalf. She then filed her first motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255, and the court held a hearing on the matter. As a result of that hearing, the court re-entered judgment to reset the appeal clock so that Ms. Shoemake could finally prosecute her appeal. Once she had done so, the Fifth Circuit dismissed her appeal in part and affirmed the court's judgment in part. She then filed the instant § 2255 motion in which she claims that counsel provided ineffective assistance during the change of plea and sentencing phases of her trial.

**Ineffective Assistance of Counsel**

---

[2] Though Mr. Wallace could have used more precise language, the context of his statement suggests that he meant "proceedings," rather than "investigation," as the investigation had concluded by the time of the hearing.

Ms. Shoemake presents her § 2255 *habeas corpus* claims in terms of ineffective assistance of counsel. The court must address claims of ineffective assistance of counsel under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prove that defense counsel was ineffective, the petitioner must show that counsel's performance was deficient and that the deficiency resulted in prejudice to her defense. Under the deficiency prong of the test, the petitioner must show that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The court must analyze counsel's actions based upon the circumstances at the time – and must not use the crystal clarity of hindsight. *Lavernia v. Lynaugh*, 845 F.2d 493, 498 (5th Cir. 1988). The petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). To prove prejudice, the petitioner must demonstrate that the result of the proceedings would have been different or that counsel's performance rendered the result of the proceeding fundamentally unfair or unreliable. *Vuong v. Scott*, 62 F.3d 673, 685 (5th Cir. 1995), *cert. denied*, 116 S.Ct. 557 (1995); *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *Sharp v. Johnson*, 107 F.3d 282, 286 n.9 (5th Cir. 1997). "When §2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011); *Premo v. Moore*, 131 S.Ct. 733 (2011).

Mr. Shoemake argued at the hearing that counsel was ineffective for:

(1) Failing to offer evidence in mitigation at sentencing, such as: (a) the recent events of losing her job (and the resulting financial trouble), having a miscarriage, and getting divorced from her husband; (b) her frequent use of the internet to obtain sexual gratification; (c) the fact that

she refused to take pornographic pictures of her children many times before she finally agreed to do so; (d) her possible sexual abuse at the hands of her stepfather, and (e) abandonment by her biological father.

(2) Failing to object to the search warrant used to seize her electronic equipment containing the child pornography used to secure her guilty plea;

(3) Failing to require the Government to produce documentary evidence that Ms. Shoemake actually sent the child pornography through interstate commerce;

(4) Failing to seek a mental evaluation based upon Ms. Shoemake's recent sexual appetite and proclivities (frequent viewing of pornography and having sexual intercourse with strangers);

(5) Failing to mention that Ms. Shoemake suffers from Type II diabetes and requires insulin shots;

(6) Failing to understand the sentencing factors set forth in 28 U.S.C. § 3553 and argue that the factors weighed against a 50-year sentence;

(7) Generally, not being aggressive enough in meeting with Ms. Shoemake, investigating, and formulating arguments and objections in opposition to the Government's case; and

(8) Failing to argue that, contrary to the assertion in Paragraph 44 of the Presentence Investigation Report ("PSR"), the offense did not "involve[] distribution [of child pornography] for the receipt or expectation of receipt, of a thing of value, but not for pecuniary gain."

As discussed below, none of these arguments has merit.

**Mitigating Evidence**

Ms. Shoemake argues that counsel was ineffective for failing to offer evidence in mitigation during sentencing. This argument fails, in part because much of the evidence she believes should have

been offered in mitigation was contained in the PSR and was considered when calculating the Guideline range:

(1) Loss of her job, Doc. 59 at 14;

(2) Divorce, Doc. 59 at 13;

(3) Little contact with her father, Doc. 59 at 13; and

(4) Sexual gratification through the internet; Doc. 59 at 6.

The other items either do not mitigate against the severity of sentence imposed – or could well be considered aggravating factors. For example, the fact that Ms. Shoemake refused at first to take the photographs before acceding to "Toby's" wishes tends to show that she was aware that doing so was wrong, but she took the photographs, anyway. In addition, her frequent use of the internet as a way to satisfy her sexual needs could show that she had a sexual addiction (as her hearing counsel suggested) – or that she simply enjoys viewing others having sexual relations – and enjoys having frequent sexual relations, herself. Her miscarriage was approximately three years before she took the pornographic photographs of her two young sons; it was not close in time to the events leading to her arrest and conviction.

The only event that would clearly operate in mitigation is the allegation that she, herself, was sexually abused as a child. However, even that allegation is weak. In a letter written to her defense attorney, Angela Shoemake makes clear that her stepfather did not physically sexually abuse her; he only "tried to":

> Then my mom's second husband, Vic Younger, was a complete jerk. I never wanted him to be in my life plus when I became a teenager he *tried to* sexually abuse me. I'm not sure I ever told my mama that so I'm not sure she should read this. I have tried to never think about those horrible times that he would come into my bedroom after mom had gone to work and *try to* lay his hands on me or *try to* sleep beside me.

Defendant's Exhibit 2 (Hearing of August 29, 2019) (emphasis added).  Ms. Shoemake created this letter after she had been charged with child sexual exploitation.  The only other documentation she offered was in a medical report dated November 4, 2010, after she had been sentenced in this case, though it was filled out by her ex-husband.  Defendant's Exhibit 3 (Hearing of August 29, 2019).  Even if the incident were better documented, it is not the kind of severe abuse that might damage a person so badly that she would sexually abuse her own children for the gratification of a man she had never met.  Certainly, counsel was on inquiry notice that his client might have been sexually abused as a child, but he made clear at the § 2255 evidentiary hearing that he did not believe that based upon the evidence at his disposal.  In sum, most of the facts Ms. Shoemake believes should have been offered in mitigation were included in the PSR, and the rest were either weak – or could also be offered as aggravating circumstances.  The court cannot find that trial counsel was ineffective for failing to further explore mitigating circumstances based upon this record.

### Failing to Challenge the Search Warrant

Ms. Shoemake argued that trial counsel should have moved to suppress the search warrant used to obtain the pornographic images of her children because the *face* of the warrant did not charge a crime, as the face of the warrant used only the term "pornographic" to describe the images, and pornography is not *per se* illegal.  However, courts do not look only to the face of the warrant; instead, courts must read the warrant as a whole – including the affidavit.  *United States v. Aguirre*, 664 F.3d 606, 614 (5th Cir. 2011).  The affidavit attached to the warrant at issue makes clear that the images the witness saw were of a minor boy exposing his genitals in a suggestive pose – which, by any rational measure, constitutes child pornography, the creation, possession, or distribution of which *is* a crime.  Thus, the warrant, read as a whole, easily established probable cause to conduct

the search at issue. Defense counsel was effective in deciding not to pursue a baseless motion to suppress.

### Failing to Require the Government to Produce Documentary Evidence that the Images Were Placed into Interstate Commerce

Ms. Shoemake also argues that counsel should have required the government to produce documentary evidence that Ms. Shoemake transmitted the images of child pornography through interstate commerce. First, as Ms. Shoemake confessed to doing so during the search of her home, a motion seeking such discovery would have merely confirmed what she had already admitted. Second, the government had obtained evidence that on February 6, 2010, Ms. Shoemake had transmitted five of the images to a person who appears to reside in the state of Washington (the state where Toby claimed to live). Doc. 59 at 6. Given Ms. Shoemake's confession and the corroborating evidence, such a motion would have been futile, and the court will not fault trial counsel for declining to pursue the issue.

### Failing to Seek a Mental Evaluation Based Upon Ms. Shoemake's Sexual Appetite and Proclivities

Ms. Shoemake also claims that defense counsel was ineffective for failing to seek a mental evaluation based upon her sexual behavior (watching pornography and finding men on the internet for sexual encounters). Counsel mentioned sexual addiction as a possible cause of this behavior. However, the Fifth Circuit has noted:

> [S]exual addiction was removed from The Diagnostic and Statistical Manual of Mental Disorders ("DSM")'s list of disorders. Unlike other conditions, the updated DSM-5 has not even listed sexual addiction as a disorder warranting further study for potential inclusion in the DSM.

*United States v. Thompson*, 709 F. App'x 758, 764 (5th Cir. 2017), *cert. denied,* 138 S. Ct. 934, 200 L. Ed. 2d 210 (2018) (unpublished). As it appears that sexual addiction is not recognized as a disorder or

condition warranting consideration for inclusion in the next DSM, the court will not fault counsel for deciding not to investigate this further.

### Failing to Mention that Ms. Shoemake Suffers from Type II Diabetes and Requires Insulin

Ms. Shoemake further claims that counsel should have argued that she suffers from Type II diabetes and requires daily insulin shots. This claim is without merit because that information is contained in the PSR, which the court adopted and considered during sentencing. Doc. 59 at 13.

### Failure to Understand and Apply the Sentencing Factors of 18 U.S.C. § 3553

Section 3553(a) of the United States Code sets forth the factors a court must consider when imposing a sentence:

> **(a) Factors to be considered in imposing a sentence.** – The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
>
> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> **(2)** the need for the sentence imposed--
>
> > **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > **(B)** to afford adequate deterrence to criminal conduct;
> >
> > **(C)** to protect the public from further crimes of the defendant; and
> >
> > **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> **(3)** the kinds of sentences available;
>
> **(4)** the kinds of sentence and the sentencing range established for--
>
> > **(A)** the applicable category of offense committed by the applicable

> category of defendant as set forth in the guidelines--
>
>> **(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>
>> **(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
>
> **(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);
>
> **(5)** any pertinent policy statement--
>
>> **(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>
>> **(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.[1]
>
> **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> **(7)** the need to provide restitution to any victims of the offense.

18 U.S.C.A. § 3553. The court will address the pertinent factors below.

**(1) The nature and circumstances of the offense**

Though Ms. Shoemake has no criminal history, the nature and circumstances of the offense are horrific. She sexually abused her two young boys, including penetrating at least one of them with

a foreign object – and did so to improve her financial and living situation. Thus, the nature and circumstances of the offense weigh in favor of a lengthy sentence.

**(2)(A) The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

For the reasons set forth in subsection (1) above, this factor weighs in favor of a lengthy sentence.

**(2)(B) The need for the sentence imposed to afford adequate deterrence to criminal conduct.**

Ms. Shoemake repeatedly testified that she did not know why she committed these heinous crimes. However, she told the Probation Service that she did so because Toby promised to move her and her sons to Seattle to take care of her. This factor also weighs in favor of a lengthy sentence – to deter Mr. Shoemake from committing similar crimes in the future.

**(2)(C) The need for the sentence imposed to protect the public from further crimes of the defendant.**

Protecting children from further abuse at the hands of Ms. Shoemake is the most compelling reason to impose a lengthy sentence in this case. Mr. Shoemake could not explain why she sexually assaulted her children and sent images of those assaults to a man she had never met. Her lack of an explanation – coupled with her cold demeanor in court – cast serious doubt regarding her claim of remorse for these crimes. This factor thus weighs in favor of a lengthy sentence.

**(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**

As set forth in the PSR, the sentences imposed in this case comported with the Sentencing Guidelines. Having reviewed sentences imposed in various cases involved in child sexual exploitation and transmission of child pornography, the court cannot say that the sentence imposed in this case, 50 years, results in an unwarranted disparity. As set forth above, Ms. Shoemake sexually abused her two young boys, created images of the abuse, and transmitted the images to a man she did not know – in order to improve her financial and living situation by moving in with that man. She also stood ready to bring her two young boys into the waiting arms of the very predator who sought the child pornography involving the boys. She chose to violate her duty to care for and protect her children – and to violate the trust they placed in her. She shattered their innocence for her personal gain. She was not addicted to drugs; she was not mentally ill, and she offered no explanation as to why she perpetrated these acts. Certainly, the court can discern none. At the evidentiary hearing in this case, her statements of remorse rang hollow. For these reasons, it is difficult to find cases which closely parallel this one. In any event, courts routinely impose severe penalties for child sexual abuse and exploitation, especially when a parent is the defendant. This factor does not weigh in favor of a lesser sentence.

### Distribution of Child Pornography for a Thing of Value, But Not for Pecuniary Gain

Mr. Shoemake argued that she did not distribute the pornographic depictions of her children for actual receipt of a thing of value, as set forth in Paragraph 44 of the PSR – and that counsel was ineffective for failing to argue that point. This argument is without substantive merit, as the Guidelines, themselves, make clear that a defendant need not actually receive the thing of value. Expectation of receipt is enough:

> If the offense involved … [d]istribution for receipt, *or expectation of receipt*, of a thing

of value, but not for pecuniary gain, increase by 5 levels.

U.S.S.G. § 2G2.2(b)(3)(B) (2009) (emphasis added). Ms. Shoemake told the Probation Service that she committed the act so that Toby would move her to the State of Washington and provide for her when she arrived. Without question, Toby promised her a thing of value – housing and overall care. Given the plain wording of the Guidelines, counsel provided effective assistance by declining to raise that meritless objection.

**General Lack of Zeal**

Though she did not state it explicitly, one of Ms. Shoemake's arguments is that counsel did not pursue her defense with zeal. She believes that her attorney should have left no stone unturned in an effort to find *something* to mitigate against receiving the maximum sentence for these crimes. Mr. Wallace testified that once he saw the child pornography that his client had produced and transmitted, he knew she was in big trouble – and told her that it was in her interest to come to an agreement with the government and plead guilty. By the time of the present hearing, some 9 years later, Mr. Wallace does not specifically recall going over the Sentencing Guidelines with his client, but he (inartfully) stated that he did so at her Change of Plea Hearing, as did she.

The court finds that Mr. Wallace was on at least inquiry notice regarding the possibility that Ms. Shoemake's stepfather had sexually abused her. However, as discussed above, her letter to him was thin gruel, as she repeatedly stated that her stepfather merely *attempted* to touch her. The only other evidence at Mr. Wallace's disposal regarding sexual abuse was a rumor he heard from an unnamed source in town. It is also telling that, though Ms. Shoemake testified at the hearing, she did not allege that her stepfather physically sexually abused her as a teenager; instead, she merely reiterated the statement from her letter, that he "tried" to do so. She had the chance to testify that she

had been physically sexually abused as a child – knowing now that such testimony could be offered in mitigation – but declined to do so. As set forth above, the attempted sexual abuse Ms. Shoemake describes does not rise to the level of trauma sufficient to cause a mother to sexually abuse her own children. Had counsel presented this evidence to the court during sentencing, it would not have affected the sentence imposed.

Mr. Wallace stated in court that he believed that his client might have been a victim of Toby's manipulation, but he did not make this argument to the court. Ms. Shoemake also states that counsel should have argued that she was manipulated into sexually abusing her children because she was in a weakened mental state. This argument fails because, according to Ms. Shoemake, Toby manipulated her by promising to move her *and the boys* to live *with him* in Seattle so he could "provide for her." PSR at 6. In other words, Ms. Shoemake alleges that she was willing to move her boys across the country and into the home of Toby – the man who wanted to see them sexually abused on camera. She was thus, apparently, willing to physically offer her two young sons to Toby (for whatever he had planned for them) – so that he would "provide for her." *Id*. That sounds less like manipulation – and more like bargained-for exchange. Such an argument would not have helped Ms. Shoemake.

Ms. Shoemake also argued, without much detail, that counsel should have objected to parts of the Guidelines calculation in the Presentence Investigation Report. However, on cross-examination, the government went through the calculation with Ms. Shoemake, item by item – as to the facts of the offenses regarding each of her sons. Through this process, Ms. Shoemake conceded that a factual basis existed to support each part of the calculation.

The difficulty Ms. Shoemake faced is that the nature of her crime is particularly heinous, and – even without a criminal history – the calculation required a lengthy term of incarceration. As Ms.

Shoemake could not identify a valid objection to any part of the Guidelines calculation, the court cannot find that defense counsel was ineffective in deciding not to raise any objections.

## Ms. Shoemake's Lack of Credibility

Another problem Ms. Shoemake faces in this case is that her overall demeanor at the hearing undermined her credibility. She appeared to cry early in the hearing and intermittently throughout; however, her crying stopped instantly each time the government established a point that was detrimental to her case. She would then quickly resume crying. The rapid changes in demeanor, from weepy to angry to weepy again – were jarring. In addition, her apparent weeping generated little to no tears, and her overall testimony was delivered in a cold manner. Her attempts to appear emotional and distressed fell flat. Indeed, it appeared that each expression she put on *was* put on. Virtually nothing about her testimony appeared genuine. These factors undermined her testimony overall.

## Conclusion

Counsel could have done a little more to investigate Mr. Shoemake's circumstances in this case – at least the possibility that she had been sexually abused as a teenager. It appears that, once he saw the hundreds of photographs of Ms. Shoemake abusing her children, he realized that she would be found guilty. He then focused his efforts on bargaining with the government for a lesser sentence than the 210 years she faced based on the seven counts of the indictment. His bargaining was successful, to a degree, as the government agreed to limit her exposure to 50 years' imprisonment – a limit the court accepted. Counsel had very little to bargain with because, even now, there are virtually no facts available that would tend to mitigate against a lengthy sentence.

Ms. Shoemake could not explain why she chose to sexually abuse her two young boys for the sexual gratification of a man she had never met. She was not taking drugs. She was not mentally ill.

She stated that her stepfather had attempted, unsuccessfully, to sexually abuse her as a teenager. The problem counsel faced is that the difficult events in Ms. Shoemake's life were not of the type or severity that might result in her choosing to perpetrate this horrific crime against her children. Also, sexually assaulting her children is not an action that could conceivably offer some form of relief from her life's difficult circumstances. Instead, as set forth above, it appears that Ms. Shoemake was simply willing to sacrifice her children's innocence to improve her circumstances. Thus, though counsel could have conducted a more thorough investigation, such an investigation would not have altered the sentence imposed in this case. For the reasons set forth above, Ms. Shoemake's claim that counsel provided ineffective assistance in her defense is without merit, and the instant motion to vacate, set aside, or correct sentence will be denied. A final judgment consistent with this memorandum opinion will issue today.

**SO ORDERED**, this, the 18th day of September, 2019.

>                                **/s/ MICHAEL P. MILLS**
>                                **UNITED STATES DISTRICT JUDGE**
>                                **NORTHERN DISTRICT OF MISSISSIPPI**